The Chief Justice
delivered the opinion of the Court:
The bill and allowed amendments in this case show that one Larkin Johnson died in 1885, intestate, seized and possessed of lots 16 and 19 in section 9 of the sub-division of St. Elizabeth, called Barry Farm, leaving surviving him the complainant and defendants, George, Benjamin and David Johnson, together with Annie E. Hackett, child of a deceased daughter, and Maty Johnson, as his five children by his first marriage with Lucy Ann Shipley, now deceased, “w^.om said Larkin Johnson married”; also defendants Emily C. E. Johnson, now Brown, surviving widow, and Ida Berry, and Fanny, Emma and Robert Johnson, as his four children by his second marriage, with Emily C. E. Johnson, now Brown; that on June 22, 1891, under an outstanding deed of trust upon these lots, defendant William H. A. Wormley, trustee, sold the same at public auction pursuant to a public advertisement requiring .only one-' third of the purchase money in cash, balance in six and twelve months with interest, or all cash at the option of the purchaser:
The sale took place during a hard rain, and the auctioneer changed the terms at the sale, and without previous warning, from one-third cash to all cash. The bill alleges that the sale was made for $2,400, a grossly inadequate consideration, to defendant Wallace T. Chapman, who assigned his bid to said Emily C. E. Johnson, now Brown, and a deed was subsequently made to her by the trustee for a recited consideration of $2,200.
The bill» further alleges that subsequently Emily C. E. Brown executed a deed of trust to Brainard H. Warner and John T: Arms, trustees, to secure one Nathan Sprague the *479 sum of $450; that this $450 was all the money that ever passed from the purchaser to the trustee who made the sale, and no proceeds from said sale were ever distributed to complainant or any of the children of Larkin Johnson by his first marriage; that holding the sale during inclement weather, changing the terms at the sale and without previous warning from one-third cash to all cash, reducing the purchase price from $2,400 to $2,200, and the circumstance of but $450 passing in good faith between Emily C. E. Johnson and the trustee, were evidences of collusion on the part of those concerned in said sale to deprive the five children of Larkin Johnson by his first marriage of their share in the property of their father.
Wherefore, it was prayed that the sale and the subsequent deed of trust be set aside, and that defendants disclose their knowledge of the aforesaid proceedings.
The defendant Wormley, trustee, answered denying any knowledge of the marriage of Larkin Johnson with complainant’s mother. He admits that the sale took place during a rain and the change of terms as alleged; that the sale was for $2,200 and made to Chapman and by him assigned to Emily C. E. Brown, and that no. distribution of the proceeds was made, as there were no proceeds. He denies any conspiracy or combination.
Emily C. E. Brown answered, reciting her connection with the property before the sale, and says, that she has no knowledge as to the parentage of complainant and her alleged brothers or as to the marriage of their alleged father and mother, but as to all such matters she leaves the complainant to maintain her bill by proof. She admits the sale in the rain and the change of terms, but denies any collusion with any one. She alleges her own children are willing she should retain their portion, hence no distribution was made. She states that she is willing to account for the proceeds whenever the children of the first marriage are held to be entitled to any portion of them.
The children of the second marriage answered adopting *480 the statements in the answer of their mother, Emily C. E. Brown.
Chapman answered denying collusion or bad faith. He admits that he loaned $340 to Emily C. E. Johnson, now Brown, to enable her to pay off expenses of sale and debt on the property and took a deed of trust as alleged.
The heirs of Larkin Johnson, by his first marriage, (defendants) answered admitting the recitals in the bill and joining in the prayers thereof. They deny having received any of the proceeds from said sale.
Isaac S. Lyon was on January 22, 1892, made a party defendant in the place of the defendants who are the alleged heirs of Larkin Johnson, by his first marriage, excepting the complainant. He applied to be substituted for complainant in the court below, but was refused. . The testimony was taken and the cause heard and a decree signed dismissing the bill without prejudice.
From that decree the complainant took an appeal to this court.
The real question at issue was in relation to the alleged first marriage. I believe it was conceded by counsel for the widow and the second set of children, at the hearing, that they would not contend that the court should not set the sale aside if there was sufficient proof of the right of the complainant here to maintain this action.
We have carefully read the evidence in relation to the first marriage. Mrs. Blew, a lady apparently of intelligence, testifies that she is about 55 years of age; that she knew Larkin Johnson and his then reputed wife, whose maiden name was Ann -Shipley; that they lived upon her father’s plantation in Maryland; that from the time of her first recollection of them they were living as husband and wife and were reputed to be married; that children were born to them while they were living on her 'father’s place; that her father was a minister of the Gospel and would not have permitted them to live on his plantation had he known or understood that they were not married people. She further testifies *481 that she never heard a question as to their not being married suggested; that every one regarded them as being husband and wife for many years and up to the time of the death of the first wife.
A brother of Ann Shipley testifies that at the time, according to the understanding in the family, when Larkin Johnson was married to his sister, he was absent for a couple of years. When he returned they were living together as husband and wife, and it was the understanding in the family that during his absence they had been married by the father of Mrs. Blew, who testified in the case; that everybody in the family and everybody acquainted with them regarded and treated them as husband and wife; that no question as to the legality or validity of their marriage was ever sug-' gested by any one to his knowledge; that complainant and her brothers, who are defendants in this cause, were the children of Larkin Johnson by cohabitation with his sister; that they were always regarded and recognized by both parents, during their lifetime, as legitimate children; that Larkin Johnson recognized him, witness, as his brother-in-law, until his death, which was some time after he had removed to this District and his intermarriage with the present widow.
Mrs. Blew in her testimony says that she never knew that either Larkin or his wife were slaves. But Shipley, the brother of the first Mrs. Johnson, testifies that Larkin was a slave and his owner emancipated him, his freedom to take place on his arrival at 30. years .of age; that this marriage, according to his recollection, occurred a year or two before the freedom of Johnson.
So, taking the evidence altogether, we come to the conclusion that one of the parties was a slave and the other free at the time of the marriage.
In the case of Green vs. Norment, 5 Mack., 86, the question of the validity of slave marriages, where they were married according to any custom prevailing in the State where they lived, was discussed. In that case the court *482 was requested to say “that there was no proof on the subject of Charles Brooks’ parents’ marriage, and that the same may be said to apply to the grandparents of the plaintiff, William Brooks and his wife.” Mr. Justice Cox, in delivering the opinion of the court, said: “ On .that subject there is proof that they lived here as free people for a number of years in the married relation, .both William Brooks and his wife, and Charles Brooks, Sr., and¡ his- wife. Each otfe of the brothers lived with his reputed wife and were therefore reputed to be husband and wife. This is clearly competent prima facie proof to go to the jury of actual marriage between the parties.”
“There was some attempt to prove by the declaration of Charles Brooks’ wife that they had been married according to the custom of slaves in Virginia. But whether this was so or not, it may be disregarded. We have held in the case of Thomas vs. Reagan, that the fact that parties who had been slaves came to this District and lived as free people in the relation of husband and wife for 'some time, was evidence of actual legal marriage between them. So we think that there was some evidence of this marriage of William Brooks and Charles Brooks to go to the jury; and if that is so, then the instruction was properly rejected.”
In the charge given to the jury, the judge said: “So that I instruct you that tire evidence which has been admitted in this case is all competent under the issue made, which includes the declarations, of the mother and grandmother of the plaintiff. That may be erroneous, but it was not excepted to at all; so that the questions of law are out of the case, and the only question is, whether, upon the whole, this evidence is sufficient to go to the jury to prove the legal relationship of the plaintiff and propositus.
“ It is .said that it is not sufficient, for this 'reason: admitting that it shows the relationship of the plaintiff to William Brooks, his grandfather, and the relationship of William Brooks to Charles Brooks, the father of the propositus, still there has been nothing proved as to the parents of *483 these two brothers; that is, it has not been proved that the common ancestors of the plaintiff and propositus, the grandfather and grandmother of the plaintiff, were ever married. If they were not married, of course, William and Charles Brooks being illegitimate, they could not inherit from each other, and the descendants of one could not inherit from the other. If they had been free white people, or free people of /color, we think there is very good authority for the proposition that where two people recognize each other as brothers, and are shown to have done so at a period so remote that it'is impossible to find living witnesses acquainted with their ancestors, the law will allow the jury to presume that fact, without which they would not be so related in law, viz., that their parents were lawfully married.
“ Eaton vs. Bright, 2 Lee, Eccl. Rep., 85, 161, is a case where everything had been proved except the marriage of the grandfather and grandmother, and where it was shown that the children recognized each other as brothers and sisters, and the court said it would be presumed that their parents were married when the period was too remote to prove the fact by living witnesses.
“ But it is said that these brothers were slaves, and, therefore, children of slaves; and that, as slaves could not contract marriage, there can be no supposition that the father and mother of William and Charles Brooks were ever married. On the subject of slave marriages, some light is thrown by the legislation of the State of Maryland and the decisions of the Court of Appeals. There is a statute of Maryland in 1777 which imposes a penalty on any clergyman who shall celebrate the rite of marriage between servants without the consent of their master; and in the case of Jones vs. Jones, 36 Md., 457, the court held that this act, by implication, made lawful the marriage of slaves with the consent of their masters; and although such marriage conferred no civil rights it did make the issue of marriage legitimate.
“Now, if the recognition of each other by two parties— *484 the mutual recognition of two parties as brothers — in the case of free people, would allow us to infer a lawful marriage between their ancestors, we do not see why we cannot indulge the same presumption as to slaves, and infer such a marriage between their ancestors as would be lawful — that is to say, a marriage with the consent of their masters.
“We think it just and proper to leave it to the jury to infer a marriage from the same state of facts as in the case of white people; so that if these people had come from Maryland, we would find no difficulty in saying that the fact that these two brothers recognized each other as brothers, was sufficient to go to the jury, as evidence that their parents who lived nearly one hundred years ago, were married.”
In the later case of Millie Thomas vs. Holtzman, (18 District of Columbia, page 65), in an opinion delivered by Mr. Justice Merrick, he said:
“ It appears in ,the proof that Millie Thomas had for her husband one Henry Queen, a free colored man, and that she, being a slave, lived with him as her husband, recognizing the relations of husband and wife between them, with the consent of her master; and during that marriage two of these plaintiffs were the fruit of the- union. The first husband died, and tiren, in a similar manner, she associated herself with another man by the name of Thomas, and lived with him, recognizing him as her husband, and that as the fruit of that union two other children were bom. Her second husband subsequently deserted her at about the outbreak of the war and never returned, and, so far as it is known, is dead. These four children, the fruit of these two marriages, claim to be the heirs at law of Millie Thomas.
“ It is objected on the part of the respondent in this case that the children of these marriages are not legitimate, first, because under the interpretation of the laws of Maryland, including the act of 1777, which recognize the capacity of a clergyman to perform the rites of marriage with the consent of the master, there was in point of fact no- marriage; in other words, that by the law of Maryland recognizing *485 the possibility of a legal marriage under such circumstances in facie ecclesiae, with the consent of the master, any other marriage between slaves was not regarded as a .marriage so as to legitimate the issue; secondly, that the act of Congress of Februaiy '6, 1879, which does legitimate or professes to legitimate all the issue of such marriages, is unconstitutional and void, because it makes a discrimination between persons of different races and different colors.
“ In the first place, it is not at all apparent that it ever was the law that a marriage in facie ecclesiae was necessary for the purpose of legitimating the issue. It is true that the Court of Appeals of Maryland in the last four or five years has decided that‘such was the law; but that decision is not binding upon us. It is laid down by Blackstone that a marriage per verba de presentí, without the intervention of a clergyman, followed by cohabitation, makes a legitimate marriage.
“ In the year 1844, that question ¡was contested in the case of The Queen vs. Millis, 10 Clark & Finnelly, 534, and by a divided court the judgment of the Irish tribunal was sustained, which had affirmed that a marriage in facie ecclesiae was necessary to give legitimacy to the issue. That was, as we have said, by a divided court; and the opinion of Lord Campbell in the case, one of the ablest opinions that has ever been written, is a most powerful vindication of the ancient doctrine that a marriage, to be a valid marriage, so as to legitimate the issue, does not require the presence of a clergyman. He cites with marked emphasis and approbation the authority of Kent and Story as to the common law on this subj’ect, certainly as it was uniformly understood in America.
“ It is not necessary for us to decide that question at this time. What has been said is merely by way of suggestion, in order to repel the conclusion that it has been definitively settled that the presence of a clergyman is necessary to validate a marriage so far as the legitimacy of the issue is concerned. It is sufficient for this court to rely, for the *486 decision of the present cause, upon the act of Congress of 1879, which was made for the express purpose of relieving the unfortunate members of the late servile race from the consequences entailed upon them by their condition of servitude. The act of Congress is so> emphatic and 'so comprehensive that it leaves no room for argument upon the question of the validity of the marriage now before the court. It provides:
“ ‘ That the issue of any marriage of colored persons, contracted and entered into, according to any custom prevailing at the time in any of the States wherein the same occurred, shall for all purposes of descent and inheritance, and the transmission of both real and personal property in the District of Columbia, be deemed and held to be legitimate and capable of inheriting and transmitting inheritance, and taking as next of kin and distributees according to law from and to their parents, or either of them, and from and to those from whom such parents, or either of them, may inherit or transmit inheritance, anything in the laws of such State to the contrary notwithstanding/ 20 Stat. at Large, 282.
“That is as broad and comprehensive as language can make it, stating in terms that wherever, according to a custom prevailing at the time, the parties entered into and recognized themselves as occupying the relation of man and wife, it is sufficient for the purpose of legitimatizing the issue of colored persons. It was eminently proper and humane and just that the law should be made, and this court is unwilling to intimate the possibility of'a doubt of the validity of the law in any respect. Certainly the suggestion that it violates any of the terms of the recent amendments of the Constitution of the United States can have no warrant or force in reason or law. The proof having been adequate to show in this case — without reciting it in delivering this opinion — that these people did live in the relation of husband and wife according to a custom then prevalent, and were recognized according to that custom as husband and wife, is sufficient to establish the legitimacy of the issue for the purposes of this cause.”
*487 It will be noticed that this statute of 1879 is somewhat different in its terms from the statute which is to be found in the Revised Statutes of the District of Columbia, sections 724, 725, 726. It does not relate to persons who have lived in the District of Columbia, as does the statute found in the Revised Statutes of the District of Columbia, cited by .counsel for the defendant to establish the contention that the statute only relates to persons who lived as husband and wife in the District, after they shall have first lived in some one of the States recognizing the institution of slavery, as husband and wife, according to the custom among slaves. Nothing of that kind appears in the more recent statute of 1879, quoted by Mr. Justice Merrick.
We think that there was a marriage in the State of Maryland according to the act of Maryland in 1777, and that, there is such proof as that we may presume at this distance of time that such a marriage occurred. The evidence is very strong in that respect, much stronger than it was in the Millie Thomas .case, stronger than it was according to the recitals in the case of Green vs. Norment, and more positive and direct, and much more satisfactory. But if this were .not true, upon the doctrine laid down in the case of Millie Thomas vs. Holtzman, before quoted, we think that in the case of colored people, one or the other of whom was a slave, who have lived together as husband and wife for a long period of time and were reputed to be married and so treated and understood to be by their friends and the community in which they lived, for the purpose of inheritance it is to be regarded as a valid marriage. In this case the evidence shows that Larkin Johnson lived with his alleged first wife for many years after he became a free man, as her husband, during which time the fact of their marriage was never questioned.
Upon that theory of the law the evidence in this case is abundant to establish such a marriage as would entitle the parties in this case who claim to be heirs of Larkin Johnson by his alleged first marriage, to be adjudged legitimate and entitled to inherit.
*488 The court below in this case dismissed the bill without prejudice, it is said, upon the ground that the proof was insufficient to establish legitimacy on the part of the plaintiff and her brother, parties to the suit. We do not concur in that opinion upon the authorities cited and the testimony disclosed by the record.

We hold that the proof is sufficient and the decree of the court below must therefore be reversed.

The prayer of the bill in this case is only that the sale recited in the bill and the deeds executed to the present widow of Larkin Johnson (since the death of Larkin Johnson intermarried with one Brown), be set aside, and also the deed of trust executed by her to secure a loan made by her after the sale should be set aside. The complainant does not ask for any further remedy. She does not ask that the property be again sold or that partition be made.
The proof does not show that the trustee to whom Mrs. Brown executed the deed of trust or that the beneficiary under that deed of Rust had any knowledge of the alleged irregularities or wrongdoing at the sale, on account of which the sale should be set aside. The loan seems to have been made in good faith on the part of the creditor and the deed taken in good faith on the part of the trustee. She was apparently authorized to make the trust deed, because upon the record Mrs. Brown had a perfect title. We think we should not disturb that deed of trust. The record shows that the application of the proceeds of the loan was the extinguishment of, a loan already existing upon the property, which all of these parties are under obligations to discharge. The deed to Mrs. Brown will be set aside, and the sale will be set aside, with the costs upon Mrs. Brown and her children, who are defendants in this .cause.
An application was made here by Mr. Lyon to be made party complainant in the place of Mary Davis and something was said pro and con, as to his having purchased her interest and having purchased the interest of her brothers who were made defendants in the case. We were asked to *489 make some indorsement of that purchase, especially by making him a party to the suit in place of the original complainant. We understand that this application was made, so far as the complainant is concerned, in the court below, and was refused and it was renewed in this court upon the same statement, we presume, that was made in the court below. We are not inclined to grant that request. We leave the parties in that respect to pursue any remedy they may have hereafter by an independent suit. We leave Mr. Lyon to avail himself of any remedy which he may have under conveyances which he has, and without prejudice to the rights of any of these parties of whom he alleges that he has purchased an interest in this property to resort to any remedy that they think to be proper in order to set aside such conveyances if they shall claim that the purchase has not been made in good faith.